We'll hear the next case in re Mirena. Good morning your honors Max Kennerly for the plaintiff's appellants. Just hold on one second I want to see if Miss Blatt is not on the screen yet. Is she? Are you there Miss Blatt? Yep here you are. Okay Mr. Kennerly go ahead. Thank you. In a the evidence in this case the scientific evidence is stronger than we typically see in multi-district injury cases. Let me give four examples of that. First typically in a pharmaceutical case the plaintiffs are swimming upstream against the FDA. In this case the FDA has already found there is reasonable evidence of a causal association between Levonorgestrel the drug in Mirena and intracranial hypertension which is why the FDA required Bayer to add this as a warning on their JDEL product which uses the exact same medication as Mirena. Second plaintiffs are often on the forefront ahead of the literature and the scientific consensus. In this case there has been a well-established relationship between intracranial hypertension and Levonorgestrel recognized in the peer-reviewed literature for years. In 2005 for example one of the top experts on intracranial hypertension Deborah Friedman wrote that there is a well-established relationship between this condition and Levonorgestrel releasing implants. Bayer retained her as an expert and then never disclosed a report from her. Third the epidemiology in this case is stronger than you typically see in multi-district litigation. In the talcum powder cases which survived Delbert the relative risk which measures how likely a person is to get the condition. Let me ask you this, you know there's this earlier we have an earlier decision in 2017 how is that different from this case? Your honor it's different in every way. In that case the same issue of the same issue of expert opinions on general causation right? So in a sense yes of we're here at the end of a Delbert but the cases could not be more different you know in the in the Mirena one case which involved this idea of secondary perforation after the implant is is put in months or years later it causes a perforation. In that case the Second Circuit here when it affirmed it an unpublished opinion identified three problems with the the plaintiff's claim there. One that the plaintiff's experts had no authorities that supported the existence of secondary perforation. In this case no one doubts the existence of intracranial hypertension no one doubts that it's associated with levonorgestrel. That's what the peer-reviewed literature has said before this litigation ever even occurred. But the argument is that there's no literature on on the cause of the general causation issue. Well I think I would disagree with that of that is what the literature is recognized so far is that there is a causal association between it. Now what you don't have is what the district court said was required. We don't have a complete conclusion of general causation but you never do. That is not how published studies work. Published studies identify particular forms of data which then experts in a courtroom use. You know there's there's not really any multi-district litigation that's ever gone anywhere or any pharmaceutical case that could point to a study where the peer-reviewed literature specifically asserts the full general causation analysis. That's just not what any of the cases. You know and I think a second point that the that the Second Circuit recognized in the Moreno 1 case was that the experts had no pre-litigation expertise in the phenomenon of secondary perforation. In this case one of our experts has published more original research on the causes of intracranial hypertension than all 12 of Bayer's experts combined. Another one of our experts, Dr. Joe Hanson, was retained by NASA to advise on cerebrospinal fluid dynamics for astronauts. He even the district court recognized that he would be on the short list for anyone in the world as an expert in this issue. Another one of our experts, Dr. Darney, has done 12 clinical trials on levonorgestrel including being hired by Bayer to conduct a clinical trial. We are nothing like the experts in Moreno 1. They have extensive pre-litigation expertise and are frankly Dr. Salpietro and Dr. Joe Hanson are two of the best in the world anywhere. They've published on this issue extensively prior to litigation. Then the third issue that Moreno 2 that this court recognized was that the the side effect could occur. Well that has no bearing here. You know there is no doubt that intracranial hypertension is occurring in these women as occurred in all 900 of the plaintiffs here. You know that's that was a very different case of essentially it was unknown if the injury even existed and the experts had no relationship and no expertise. Here no one doubts the injury exists. No one doubts the literature beforehand has described this and described this literature is 3.6 to 7.6. In the talcum powder cases it's a 1.3. In the roundup cases it's also a 1.3. This is much stronger epidemiology than you typically see in these cases. And I think you know as an example here of how the court went astray and something that Bayer repeats here is Bayer references these five studies of oral contraceptives. Now none of those studies involved something with just levonorgestrel in it which is how Moreno works. And it's unknown how many of the drugs had any levonorgestrel at all in them. It's possible none of them did. This court in Emergianos affirmed excluding an expert who had done exactly that. They had mixed together studies that involved different chemicals from the one at issue. And what the district court held here is that our experts were required not just to you know analyze and incorporate these studies of completely different drugs but that they were required to accept the conclusions that Bayer was drawing from them. And this is only a part of what has gone wrong here. I mean the truth is district court was in a race to dismissal here. We had to use discovery from the prior litigation. Our clients did not get any chance to offer individual proof. We had to do summary judgment in reverse order. You know that's why we're here and why we believe it's a de novo review and not even just a Daubert issue. You know you don't think the district court did a careful analysis right or wrong. I think it was 150 page opinion or something like that. Well everything leading up to that was much faster. But I would say it wasn't a careful analysis. It was a cross examination. There was nothing that would be different in a cross examination at trial than what we saw in court there. As I understand it your view is that it was almost too careful. It got too much into the weeds. Is that right? It did go too far into the weeds. That is our view of it and the court was focusing on expert methodologies. It was an unusual challenge but you know look and it is somewhat unusual at least in my view to to exclude so many different expert reports but in each one or with respect to each one just Engelmeyer seems to have done maybe too thorough job maybe that's one way to put it but a very thorough job of assessing the deficiencies. Well it's not assessing methodological deficiencies. He is weighing the scientific evidence himself on very discrete scientific conclusions. That's the core problem here which is instead of looking at well are these experts qualified? Can a district court do that on a Daubert motion? In other words it's not a summary judgment motion. A district court is supposed to take a hard look and on appeal there's a highly deferential standard of review. So as we have in our briefs the hard look standard doesn't really have any foundation in this court's precedent and what the district and this court also is reviewing on a de novo for application of law to facts. The Third Circuit has said the same on Daubert of it's one thing if a district court has deference towards you know the manner in which it is assessing a methodology but if it improperly applies the law to the facts that gets a de novo review. So our view is no a district court should not be weighing the evidence and that's what this court's precedent have. You know Your Honor had the same as on the second on the Southern District. Your Honor had the Figueroa opinion with a vaginal mesh case and that was much more in line with what Daubert and Amorghianos request of a judge which is to look at the methodology. I had another one I can't remember the name of it there was another one where it was the same kind of analysis and I precluded the expert opinions on the Daubert part because they were not reliable and then proceeded to summary judgment. But in any event you have three minutes for rebuttal we'll hear from your adversary. Thank you and may it please the court. My name is Lisa Blatt and I represent the Bayer defendants. For two reasons the district court did not manifestly err in exercising its gatekeeping role to exclude plaintiffs general causation experts. First the experts failed all four general Daubert factors and second the experts relied on multiple flawed methodologies and inappropriate sources and data. Perhaps you could pause for one moment and help me out on something that I've wondered for some time. Manifestly error what's the difference between erring and I mean if it's obscure error that's okay. Well it's abuse of discretion and in Amorghianos the court said that means manifestly error. I think it's just a you got to be really wrong in terms of all right but they're your words and they sound more rigorous to me then you know. I'm sorry to sidetrack you but I wondered that for some time. No I mean manifest just means patently I think but we could also talk in terms of abuse of discretion. Fair enough go ahead. But as to the first reason we don't think this court should be the first court ever to reverse a district court for excluding an expert that failed all four of Daubert's general factors which after all the Supreme Court developed in a drug causation case. The court below recognized that expert testimony that flunks Daubert may still be admissible but here the plaintiffs face. Is that where we get to the hard look after at that point? Yes well you get to the hard look in two ways. The court said look you fail all four factors because you didn't test there's no general medical acceptance it's not peer-reviewed but I'm gonna give a deeper look and see if there's anything else but the court also gave the same sort of hard look that the other Morena case came and that's from this court's decision in a Morgianos which says a court should which means the court is required to rigorously examine the facts and the methods that the expert uses and I don't see there's there's any Delta or daylight between the word rigorously examined and hard look. I think there's just another common sense of way of saying you're not supposed to give a soft look you're supposed to rigorously look at it. But that's during the that's during the Daubert analysis not afterwards. Right right and Daubert I mean quintessentially is the you know you don't usurp the jury's function by actually looking to see you have to give an independent look at the literature and independently determine if the sources and the data the expert relies on is sufficient to support your conclusion and that's from the Supreme Court's case and Joiner and also this court's decision and a Morgianos. So the expert I mean that the district court is the underlying facts and data that's that supports the literature. But here the basic problem was all seven experts developed their opinion solely for this litigation. No scientific source connects Levin or Gestural on any product much less Mirena to the idiopathic intracranial hypertension. And Mirena has been around for 20 years used by over 42 million women. It's also a birth control device that's disproportionately prescribed to overweight women and the hypertension at issue here is highly associated with overweight women of reproductive age. So any expert that wants to reliably conclude that LNG or Levin or Gestural can cause the disease here has to grapple with the overlapping risk factors of age gender and weight. And here in terms of the actual opinions here the court appropriately faulted the four opinions that relied on the existing sources Moyet, Plunkett, Wheeler and Fraunfelder for standardless and misapplication of the Bradford Hill factors, cherry-picking sources, selective use of case reports and misciting studies. And any one of those errors in addition to the four Dobbert factors would be sufficient to survive an abuse of discretion. And as to the other three experts who opined on how it's biologically plausible that the Mirena could cause the disease here, the court faulted them because they among other things admitted that their opinions were only hypothesis, they misread the literature, they speculated as to critical links and didn't justify their assumptions about the cause of IAH and moreover two of them could have tested parts of their theory but just didn't. And these are the excuse me the court on page 93 acknowledged its role was limited to determining if the experts methodologies were based on mere guesswork or conjecture unsigned unscientific scientific principles which would in turn allow the jury to rely on guesswork. So the court recognized that obviously once you get past the point of reliable admissible testimony then the persuasiveness of the expert or quibbles about the expert would be issues for the jury. But you know in my opinion this is a museum quality district courts opinion. It's hard to find an opinion that was so thorough so well reasoned and the court should not be faulted for actually rolling up its sleeves and doing what the Second Circuit told district courts to do in analyzing Dawbert motions. I'm turning to the summary judgment question. The court properly entered summary judgment in absence of any expert testimony as to general causation. I think two principles govern that here. First the other side doesn't cite any state that dispenses with the need to prove that's before you get to individual proof of specific causation. Nor do they dispute the presumptive notion that in complex medical cases you need expert testimony. Can you just clarify for me the in the context of this case. Sure so if you're a woman who has this idiopathic intracranial hypertension you have to first get past the general causation that the drug is even capable. And then you get to the specific causation as to what actually could have caused it in this individual case. It's in other words the first inquiry is that the product capable of causing this injury and then what more do you need in terms of specific that it actually happened I guess in this case. So the first part is could it and the second part is did it. Yes so like in an asbestos case you look at does asbestos in general cause whatever lung problem you have and then you're arguing on did the worker smoke or did he have exposure to other substances that could be the plausible. So here you'd be arguing about you know like temporal stuff like for instance if a woman had the disease before she ever started taking the Mirena those would be arguments about specific causation. But so the clinic question is just is it is it is it scientifically plausible in any woman or in any person I guess for the for the hormone to cause the swelling of the brain hair that causes a disease. Could you explain for us non-experts how the Bradford Hill factors factor in that is to say is that a required part of the inquiry or is that just a way to look at. It's one appropriate way that courts have recognized that an expert can analyze causation and looking at epidemiological studies. But many courts I think it's the first and the third circuit said you know it has these nine factors and you can't just you have to at least explain why you're relying on the various factors and what the court below said here is that the experts just sort of said well they all fit and in many cases at least the first one there was misapplication of all the factors. But for the three experts who relied on Bradford Hill the first three that the court addressed the court faulted them for sort of having no standard or rudder in terms of the application which the courts of appeals have recognized is subject to reverse engineering and manipulation and bias. So you at least have to articulate what you're doing. It's kind of like a multi-factor test the court would apply and you sort of have to explain why you're giving weight to one factor. And I think what the court was saying is it would have been more credible had you acknowledged that some of your factors really didn't work out and it would have had some more stability and credibility to the analysis. Are all of the plaintiffs similarly situated in terms of the applicable law? Yes and the district court said he read all cases cited that with 50 states the same thing happened in Marina One. I only you know I read the cases they cited but sorry that we cited but they don't cite any case that says you don't need general causation. It's such a fundamental concept of tort law. So yeah they're similarly situated in terms of state law. And they don't cite anything in their briefs they're just they're court for what they said cut and pasting but the judge wrote in his opinion I actually read the cases and I'm quite confident. Apparently there was some issue with respect to Illinois law but that is not my area of expertise. Right and that Illinois case just is a summary dismissal for failure to show specific and general causation. And so I think the more salient point is it was incumbent upon them to sort of say well what case how is different than the law of other 50 states? Because this is such a generic proposition. But you're right that is a matter of tort law generally general causation is a basic principle. Yes and this was the subject of the Marina One case so and it was you know to me not subject to any reasonable dispute that general causation the whole battle in that case is whether you can get beyond expert testimony. It seems so obvious that you have to show general causation or you get to specific causation. I think that basically just goes you don't want the jury to speculate and you know a case like this. But if there was some particular look there was some particular quirk in some state Louisiana whatever then that might make a difference but I haven't heard. Totally fair and I said the district court had briefing on it and he goes through and says I've looked at the states and that the court was confident in the way he determined state law. It's also this is an eerie case and you certainly don't want to be in the position of where you're stretching state law. As a court sitting trying to interpret state law you'd be breaking new ground for any state to say there was no general causation. Thank you for the rebuttal. Okay thank you. Thank you your honor. I think critically though not one state anywhere in the country follows general causation the way that the district court did here. Now general causation these actual state laws the defendants never raised at all until a reply in support of their motion for summary judgment where they attach the table with just a series of citations and no explanation. Here the district court did not apply general causation the way that would in New York State the way that would in any other state that has a general causation. Here the district court didn't have a bellwether didn't have particular plaintiffs who could have brought in particular evidence. It asked the plaintiffs to prove general causation in the abstract unconnected to any particular plaintiff. Well general causation so I think but you can correct me if I'm wrong the idea of general causation we could describe it as could should but it's it's it's without reference necessarily to specific victims or specific injured individuals and so the question is can this product is this product capable of causing the injury at issue? Why would you need specific plaintiffs as opposed to experts? So in this particular context even more than others the way this condition is diagnosed is through a differential diagnosis. The way that every other cause that has been identified for intracranial hypertension from eating polar bear livers to taking too much retinol has been identified through a differential diagnosis by a physician. Here we had no opportunity for that none of the plaintiffs was able to actually have an ophthalmologist who is the person who diagnoses this condition look at them diagnose them review their record and say your your cause was the levonorgestrel which is recognized in the literature as a cause for this. The district court skipped over that. I mean the question is why would you even do that why would you need to do that if the product cannot as a scientific matter cause that kind of injury? Well your honor I think it's part of how you prove it can cause the injury would be through a differential diagnosis and that's the problem here which is the district court on this one limited subject the district court did not allow us to even present that proof and I think in the general sense to what you're suggesting you didn't have that proof. No we were not allowed to present that proof we have multiple clients who have their own doctors writing in their medical records that the cause of this was their Mirena but we were not allowed to present any proof for any plaintiff whatsoever we weren't allowed to call an ophthalmologist to show a plaintiff that's why you know that's part of the race to dismissal here which is that the district court had followed what most courts do and had done a bellwether process we would have started out with individual plaintiffs instead of abstract reports on general causation we would have had individual plaintiffs with their own doctors plus all of these experts the district court never let us present any of this. How many plaintiffs are there? That's part of the problem here. And one of the things that you know counsel said in her remarks is also embarrassing. How many plaintiffs are there in this this action? As the last I looked I think it was 926 but I don't know if there had been new filings in it since then. And none of them have been able to brief their state laws nor to present their doctors for it. One thing counsel said is that Do you know by chance whether that number would have been a robust enough sample to make a conclusion about general causation? A statistically robust sample? So it would depend on the type of study that you did but what I would say is actually Bayer itself reviewed a hundred plus adverse event reports like this of women who had intracranial hypertension. Our experts use that data to be able to establish the dose response relationship and how this occurs when the levonorgestrel levels are high. What I guess I'm trying to understand is if you have whatever 986 plaintiffs many if not all of whom could have gone to their medical expert and had some then couldn't you get an expert to use that sample if it's a robust interview? You could have then a debate about whether the sample is statistically robust enough but why not do that? So your honor the truth is is that this was done that is the Valenzuela study was looking at particular patients and comparing them to people with you know identical characteristics for them and you know redoing that with our client saying the problem with using your your litigation sample is you will inevitably get a defense expert who says that you have self-selected by your clients that you know you've cherry-picked who you've put into it which is why we can't really use it as our own statistical sample for but the Valenzuela study did exactly what your honor is asking. It was a practice of ophthalmologists two different practices in two different continents that looked at their own people with intracranial hypertension and compared them to other other women who didn't have it but met the same characteristics and found that the Mirena users were three to seven times more likely to have intracranial hypertension. I see my time is up. All right thank you thank you both the court will reserve decision.